Good morning, Your Honors. May it please the Court, my name is Kevin Snyder, and I am representing Gene Caldwell, the appellant. This is a case of first impression. Is the Internet and Establishment Clause free zone, or can a party have standing to challenge the government when it provides religious alignments for particular, I mean provides alignment to religious beliefs when it's done online? The Court recently, in an opinion last month in an en banc decision, stated that unlawful acts performed in the physical world remain illegal if done in cyberspace. In trying to find a case that is analogous to this type of Internet Establishment Clause standing issue, the parties have focused on two competing cases. The university defendants have looked at Valley Forge v. Americans United for separation of church and state, and the appellant has pointed the Court to the Ninth Circuit line of cases involving parks and war memorials. In these cases, particularly Buono v. Norton and Ellis v. La Mesa, the standing. One is the government has aligned itself with religion. Second, there's injury due to not being able to freely use a public area. It is our position that a website is akin to a public area. It's like a room with many buildings. It's like a park with many points of interest to visit. It's more like a library? Yes, that's correct, Your Honor. We believe, then, that Buono is instructive to this case, and I'd like to just review how it is analogous to the Internet. In Buono Let me ask you this. As I read the complaint, the interest that Ms. Caldwell asserts is her interest in becoming informed about what's going on in the community, in the community, about the issue, subject of evolution and religion and how those subjects intersect in the teaching of biology in public schools so that she can participate in debates, elections, and processes having to do with those things, right? Yes, that's correct. Okay. So that's her asserted interest. How is that asserted interest in any way individualized or particularized? Because it is an interest that is an interest in being well-informed on a topic of public discourse is one that in America we hold in common, right? That's correct. Okay. So how is it a personalized grievance that can result in a particularized injury? Thank you, Your Honor. The reason is we believe it is similar to a park, like a large desert reserve. Yes, but you have an aesthetic interest in a park, and the guy who went to the preserve down in Riverside used to be the superintendent of that park. He now lived in Oregon, visited it four times a year, loved the place, and had an aesthetic interest in that park, which he could not pursue without offense from the symbol of the Latin cross that was erected on that property, which is quite different from an undifferentiated interest in being well-informed. Well, in those, in Buono and in, for example, Ellis versus La Mesa, in those instances, there are places, points of interest that people can visit for a whole variety of reasons. Could be aesthetic, could be educational, nature, that sort of thing. We don't see that as particularly distinguishable between someone wanting to educate themselves and visiting various websites, and so we see basically the same sort of thing. In other words, if you went to a library and you disagreed with some of the positions taken by authors whose books are in the library, you would have the right to have the library stop housing those books? We would not, and the reason is because the library is not the government adopting the views in those books as it are. So it is the government making views available to you, right? Yes. In this case, we believe it's different because the government is not merely making views available. As to religion, it is taking a view, and we believe that's significantly different. Counsel, does it make any difference that this woman has children in the public schools in California? I believe she would have a heightened interest, but any member, when a public area is opened and the public is invited into it, their own personal reasons for entering that public area doesn't change the issue as to whether or not they have standing. But, I mean, arguably, yes, it could increase her injury. Well, it's an interesting point because the sort of bookend cases, Doremus and Stump, Stump? Lost the name, but it's Stump. In any event, on the one hand, the parents objected to a statute which required the Bible to be read in a classroom, and they lack standing to do that because they didn't have a kid in that public school, as contrasted with the other case where there is standing because there is a kid in the school. And here, I mean, there's nothing like that. She's not making any claim about what her children are being taught in that school. That's correct. It's far more remote, far more remote. She didn't even say that her kids are being taught in accordance with the views that she doesn't like being described on the UC website. Yes. And what she is saying, in some ways, the prayer and the Bible reading cases are not on point because you have direct contact. Well, of course, but that's the key. They are very much on point because there is no  And that's part of your problem, isn't it? We don't believe so. In the war memorial line of cases, the plaintiffs would come into a park, a public area, and because of the religious messages, would not be able to use all portions of the park freely. We feel that a website is the same, is very much the same. And in fact, it is no defense that someone deliberately goes to a specific place in a park where a war memorial is at. We think in the same manner, the fact that the plaintiff has to tend to avoid the misconceptions portion of the website does not change the fact that that is there. She has to stay away from that. So that is how we would review that. Unless there are other questions, I'll continue on with, I believe, the analogy between Buono and this case. That is, in Buono, you have, again, a large public area that is owned by the government, and the government invites members of the public to use and enjoy a website. You have a government-controlled website in which the government invites members of the public to explore and enjoy. In the Mojave and the Buono – But the same is true of the university library. That's correct. The difference between the library – and maybe we should discuss this – is that the library has many viewpoints on it. Yes. In this website – Is that on the UC website? Yes. I mean, it's got hundreds and hundreds and hundreds and thousands of viewpoints by UC professors. I mean, that's the heart of academic freedom. They can describe things any way they please, can't they? They can. This is the difference, is that the government has taken a position, aligned itself with a specific religious position. Now, well, what – look, the professor who – I think his name is Caldwell, actually, but Professor Caldwell posts this – writes whatever one does to a website, creates it, crafts it, and describes a whole bunch of things, which he could do in a book or in hard copy form and put in the library at UC, as Professor Caldwell's views on how evolution and religion could be taught and how certain questions could be answered. And he could make the precise descriptions of religious views and anti-religious views and whatever, as he does on the website. So why is the one – why does the one create a standing to complain and the other doesn't? One involves academic freedom. Or if it's merely a book, it involves a free speech. Which is akin to academic freedom. It's a cousin of it. In this situation, you have a government website where the government says, this is the right view. Well, I mean, let's just focus. I'm saying if he could take precisely the same thing that's on his website and make it into a hard copy, staple it together, and put it at the UC library, what's the difference? It's still in the UC library. It's still by a professor at the University of California, salaries being paid by the state of California. And it says precisely the same thing. What's the difference? The difference is you're having the university as a whole putting – or the university or the university's museum as a whole taking a position as an institution, a government institution, on a religious issue. That's different from them giving their individual professors the freedom to teach and to write freely. I know. I'm trying to just focus. Take the hard copy of the website and put it in a display, a prominent display at the UC library. What is the difference? If you're focusing on the professor or the university itself? I'm focusing on this precise website. Make a hard copy of it, download it, make a copy of it, and put that copy on a display case like that at the UC library. What's the difference? I think the difference is that the display – one is one of many books that are available. If the library is simply dedicated to this issue of evolution, let's pretend there's a library just on evolution and all of the books are what is contained on the website. If that is the case, we think there would be a violation because the university is taking a specific position on a religious issue. They're not saying this is lots of different religious issues and we're educating you on them relative to evolution. They're saying this is government orthodoxy. That is the difference. There's a difference between academic – in other words, we're almost trying to conflate – we're not conflating. We believe the court is confused because it's conflating a free exercise – or I'm sorry, not a free exercise – freedom of speech with the establishment clause. That's what's going on and you have to keep those separate. Yes, scholars can freely lecture and write and publish and they can put it on the website, but when the state says, by the way, this religious view is orthodoxy as opposed to another view, that's an establishment clause violation. Let me ask you this. If our colleague John Noonan, who is a prominent Catholic scholar, who is a professor at the University of California, puts a copy of his theological views on the website, which I don't agree with, on a website, and I go look at his articulation of a particular theological issue, I'm offended. Does that give me standing to sue the University of California for having posted Noonan's Catholic views on the website? If Judge Professor Noonan were to merely make use of the university website and libraries to put his materials on, you would not have standing. If the university said, Professor Noonan's, Judge Noonan's materials are the state view on religion, then you would have standing. So you have to have some magic words. It's not just posting it on a university website. Yes. There's, in other words, on one hand you're talking about free speech, academic freedom. That's fine. The other hand, you're saying the university is taking a position on what is orthodox. That is not fine. Let's talk a little bit about that. The museum is part of the UC system, and it's their sponsorship of these materials that you think makes the difference? Yes. The UC system has not only sponsored it, but they have taken the religious position, an orthodox position. That's the problem. It isn't that they're making these materials available. Well, I've just been puzzling over this one article that was published in the New York Times. One page says, this is the way one should respond that religion and evolution are not inconsistent, and so how do we know that that is the museum's position representing it to the public? It is, and the museum shoots people over to a group of denominational statements, and these denominational statements all show an incompatibility between religion and evolution. For example, let me read one sentence, if I can indulge the Court, from the Presbyterian Church, whereas the dispute is not really over biology or faith, but it's essentially about biblical interpretation, particularly over two irreconcilable viewpoints regarding the characteristics of biblical literature and the nature of biblical authority. In essence, within the faith community and Christianity in particular, there is a schism between a literal interpretation of the first couple of chapters of Genesis and a literary interpretation. Those who take the literary view find that evolution and religion are not incompatible. The university has adopted that position, and for authority for that position, it shoots you over to a website of all these denominational statements. Supreme Court stated clearly, government support of the distribution of religious messages by religious organizations violates the Establishment Clause. Again, and that's Texas Monthly versus Bullock. I have two, unless there are pending questions, I would like the Court to allow me to reserve the final two minutes. Good morning. I please the Court, William Carroll, for the State Defendants Roy Caldwell and David Lindberg. I'll be sharing my time today with Mr. Sturgill, who's representing the Federal Defendant. Counselor, exactly what does the website say? Does it say the University of California hereby endorses X, Y, Z? Your Honor, what the website does is educate about the secular topic of evolution. That's correct, but he's asking a very precise question, and I think it's kind of critical here. Is there sponsorship by the UC Berkeley or the museum, which is itself, I guess, a part of the government? If I may quote the opening page of the website from our Exhibit 1 of the request for judicial notice, understanding evolution is a non-commercial education website teaching the science and the technology. This site is here to help you understand what evolution is, how it works, how it factors into your life, how research into evolutionary biology is performed, and how ideas in this area have changed over time. So that is the purpose of the Understanding Evolution website. It has been drafted, it has been prepared by funding provided by the National Science Foundation. It is sponsored by the Museum of Paleontology at the University of California, and it serves as an educational resource for people in California and throughout the country or world who have a curiosity about evolution. So there's this particular page, which is the focus, I guess, of this, which says that religion and evolution are not incompatible. Now is that a position taken by the University or taken by the museum, taken by the institution, the university? That is a, it is one page, and... I understand that, but this is kind of critical, at least to my thinking. No more or less than any other educational resource is made available by the university for the benefit of the public to educate itself. Is it, does it say this is not necessarily our position, but this is a way that teachers have dealt with the problem? It doesn't say that. In context, it does. In context, this is, in context it doesn't matter. It appears that we are venturing off into the merits here, and I would like to return to standing at some point and make some points there. I'm looking critically at standing. That's what I'm trying to focus on. And if in fact this is the pronouncement of the government as to its view of religion, I think that that is a critical point. If I may, what is critical is to understand the context of this particular page, the content of this particular page in the context of the website as a whole. The inquiry under the Establishment Clause is whether an objective observer would see a predominantly religious purpose underlying the challenged content when viewed in context. The basic point we have on the merits is that this particular page must be viewed within the context of the entire website consisting of hundreds and hundreds of pages that talk about the history of evolution, the specific science of evolution, the evolution of evolutionary thought, and in one context, some of the controversies surrounding evolution. The website makes it abundantly clear that the purpose for having this misconceptions section, which is one subset of a sub-site of a sub-site in this website, is to allow teachers to better communicate with students who may have misconceptions about evolution as a result of the wider controversies that occur in society. For the express purpose of teaching about evolution, it is clear in this circuit under the Pelosa case that teaching evolution is a secular enterprise. This particular page occurs within the context of the enterprise of teaching the secular topic of evolution. So to focus unduly on this one single page distorts the inquiry as far as the merits subject goes. I have no problem with the merits, but I'm just wondering about who has a right to challenge and complain. Wonderful. Let me focus on the standing issue. First of all, let me say that this Court need not fashion a novel rule of Internet standing for purposes of this case. This case is readily disposed of through existing precedents, Valley Forge, and in this circuit the Buono case, and more recently the Vasquez case. Valley Forge is really the touchstone of the analysis here. There the Supreme Court made it perfectly clear that the merely taking offense at perceived violation of the Constitution cannot in itself constitute the particularized and concrete injury necessary for the injury in fact component of standing, which is the irreducible minimum requirement, constitutional requirement, for standing. In this case, well, in this case the plaintiff has the sole allegation in the complaint is that the plaintiff was saw the website content and was offended by it. That is the sole allegation. Under Valley Forge, that is not enough. Now in response to our motion in the district court and in response to the briefing, plaintiff has since argued that in her briefs that her use of the website has somehow been impaired. So in doing that, she seeks to analogize to the impairment in use, the public land display cases in this and other circuits. The Buono case is the primary focus here, and in Buono, this circuit made it abundantly clear that in order to establish standing, there has to be a personalized injury that arises as a consequence of the challenged constitutional display, as a consequence. In the case of Buono, the plaintiff was able to establish that his frequent visits to the park and his aesthetic appreciation of the park was damaged. His use and enjoyment of that Mojave preserve was damaged as a result of the offense that he took at the perceived constitutional violation. Here there is no such allegation. Now if in fact there is an allegation that her children are in the public schools, if she'd gone further and said, I'm really concerned that this may lead to a teaching in the public schools of California that is inconsistent with my view that there's an incompatibility between religion and evolution, where are we then? I think we're outstanding, Your Honor, because there is ample Supreme Court precedent that holds that such these sorts of perceived injuries are not adequately imminent, that they are abstract and cannot support standing. There must be an imminent injury that is alleged, and the sort of injury described by Your Honor wouldn't qualify under existing precedent. The Scrapp case, I think, disposes of that argument pretty nicely. Let me turn to, I want to say a few words about the Vasquez case, which was decided after the pleading, the briefing closed in this case. And I think it serves as some apt guidance here, because the Vasquez case does address this theory of direct contact without necessarily an impairment of use. And this circuit addressed it in the context of a city seal by the County of Los Angeles, and the plaintiff in that case was an employee and a resident of the County of Los Angeles, and came into frequent, regular, and indeed pervasive contact with this city seal. He didn't allege an impairment of use, so the case is different than the public land display cases. And it was really the first time this circuit had the opportunity to address this notion of under what circumstances can direct contact in itself give rise to injury in fact for standing purposes. And the opinion makes it abundantly clear that on the one hand, direct contact can be abstract and tenuous and insufficient to support standing. And on the other hand, the facts that we have, that we encountered in Vasquez, where there was pervasive, regular, forced contact by the employee and resident of Los Angeles County, could in fact support standing, even though there was no impairment of use, even though there was no avoidance of any of the display itself. Under those circumstances, where there is continuing, regular contact, some other circuits phrase it somewhat differently. As part of the plaintiff's daily or regular routine, contact that occurs within the home community of the plaintiff, none of those facts are present here. We have, in effect, to use Judge Rimer's analogy, we have in effect a person who has picked up a book and turned to a page and decided that she disagrees or is offended by a particular page in that book. There is no allegation of any ongoing, regular contact that would suffice to distinguish the alleged injury here from the abstract and non-concrete, non-particularized injury of the sort that we saw in Valley Forge. The task of this court is to decide at what point you can distinguish between mere offense at an alleged constitutional violation on the one hand and a separate, concrete, particularized injury on the other. By looking at a page on a website on one occasion and having no occasion to go back and re-read that page, in contrast to Mr. Buono, who made regular use of the Mojave Preserve and did it two to four times a year, there's no allegation of any need why the plaintiff would need to continue to expose herself to what she finds offensive on this website. Now, if the allegation were that my children are in the public school and I believe that their biology teacher has been influenced by this pronouncement of the government, and I want that influence removed now, would that be enough? I'm still not hearing an imminent injury. If the allegation was that my child is in public school and is being taught the content of this website, and the biology teacher is communicating the substance of the website, a handout in class, there may be an argument under the Abington School District case, the Shemp case that Judge Reimer pointed to before, but there's nothing even remotely resembling that here. I just wonder, where is the line? I think we have to get much closer to the actual use of the materials in the classroom. And again, that's a line that we're not approaching in this case. So if there's no further questions from the Court, I'm prepared to turn it over to my colleague Mr. Sturgill. Okay. Mr. Sturgill. Good morning. May it please the Court, Lowell Sturgill for the Department of Justice and the National Science Foundation, which has also been sued by the plaintiffs. Before I forget to ask the question, mootness? Yes. You mention it. There's nothing concrete put in about it, but the complaint does allege that the NSF funding expired in October of 2006, October 31, 2006, I think. Is there anything beyond that in terms of funding by the feds? No. I checked before we wrote our brief. I checked before oral argument with our contacts at the National Science Foundation. They tell me that the grant did expire on October 2006. There's been no subsequent funding, no subsequent extensions, nor could there be, because once the grant has expired, it can't be extended. If Cal Berkeley wants to have more federal money for this website, it has to submit a new grant, and that new grant would go into the pile of the 40,000 per year grant proposals that the National Science Foundation considers. Is this the kind of thing that would lend itself to the argument that it might be repeated, that you might give this kind of a grant in the future? It's not. First, I would note that the plaintiffs haven't argued that, but it doesn't fall within that exception, because the law says there has to be a demonstrated probability, is the key term, demonstrated probability, that the action will recur. And here there's just nothing even close to that, because, again, we're dealing with a situation where any new money would have to be granted through the usual peer-reviewed grant proposal process, and they would have to compete with 40,000 other applicants anew in order to be granted this money. The peer-reviewed panels are made up of independent experts, and these experts make a recommendation, and then the National Science Foundation will make a determination. But there's nothing close, again, to any kind of suggestion there's a demonstrated probability. In fact, there hasn't even been, to our knowledge, a request by Cal Berkeley for additional funding. I think in answer to Judge Reimer's question, it's sufficient for you to find that the case is moot, that there is evidence in the record that the grant was scheduled to expire on a particular date, and the plaintiffs, of course, always have the obligation to demonstrate that the Court has jurisdiction and standing to Article III jurisdiction to decide a controversy. And they've done nothing to show that there has been any funding. There hasn't been. You have the sworn briefs from counsel for the government who have explored this with the client. But if the Court has any questions about it, we'd be happy to provide an affidavit from the agency. We haven't done that because it's not part of the record. But if you'd like that, we can do that. There's no document that's judicially noticeable that says this, or we would have provided it. Basically, when the grant expires, it just expires. There's no letter that confirms that it's expired or no e-mail or anything. So there's nothing that we had that we could provide you that's judicially noticeable. But this case is over as to the federal government. And the only allegation that the plaintiffs have that it's not is in a footnote in their reply brief. They cite one of the Web pages that contains a statement by Cal Berkeley that the Web site was created by Cal Berkeley with support provided by the National Science Foundation. And they're trying to use this to show that the government, the federal government, has sort of in some more ongoing manner endorsed religion. But that's not what that says at all. First of all, this is not a statement by the National Science Foundation at all. What the record shows is that the National Science Foundation provided the grant, but it had no responsibility for the content of the site or certainly not for any particular statement. Those kinds of questions it delegated, not delegated, but it allowed Cal Berkeley. So this is a statement by Cal Berkeley, not by the federal government. So this citation in the footnote is not sufficient to even allege that the federal government itself has engaged in any sort of ongoing endorsement of religion. Other than that, they just raised the question that, you know, there isn't a document in the record other than the complaint, which shows that the grant actually has expired. But, again, I think you don't need that because you have what you have in the record shows that it was set to expire by its natural terms on a certain date. You have a sworn statement by the government that it did and nothing to the contrary in the record. But, again, if you'd like something from us, we'd be happy to provide it. For that reason, I think the case is clearly moot as to the federal government. That's the only ñ this grant is the only alleged relationship between the federal government and this Web site. There's nothing else. With respect to standing, we agree with the district court and with counsel for Cal Berkeley, and for the reasons stated in our brief, we think the district court correctly dismissed the case for lack of standing. And that being said, I think we would just rely on our briefs unless there are any further questions. Okay. Thank you, Mr. Randolph. Thank you. Mr. Smith, in particular, if you would. Yes. To comment on the mootness question. Yes. In the Ninth Circuit, the burden is on the defendants to show mootness. The defendants have to show that the ñ they have completely and irrevocably eradicated the effects of the alleged violation. It's not on ñ and when you're looking at the four corners of the complaint, it's not on the plaintiff that has to prove that. It's on ñ Well, of course, the complaint ñ I can't remember. Paragraphs 16 and 19 allege that the grant expired, not that it was set to. I mean, they allege the grant expired October 31, 2006. In the record at page 17, it says that it's an estimated expiration date. I don't know what's in the complaint. I believe that is ñ that is in the complaint if it's page 17. There are two allegations in the complaint, one of which says it's expired. Anyway, do you question that? Well, we question the issue actually of the effects. The effects is that the offending religious sites are still on there. Those haven't been eradicated, and the burden is on the defendants. Well, let's say there were some effects. What kind of a remedy would you want? They're not going to be doing anything further. In the Lukowski case, which was cited by the Department of Justice, that court said what they could do is they could take the grant money and return it to the treasury based on restitution theory. And the court ñ That's a standing issue, isn't it? You can't fund it? No, the court said that is actually a restitutionary issue. And that was Lukowski. And they cited that case as their main case, and that case was actually vacated. The one thing is if this court doesn't find that there is standing in a case such as this, then it could indeed ñ this court could post the Ten Commandments in its lobby on ñ if it can't do it on its lobby, it could put it on its website. My time has expired. You want to just finish your statement? Yes. The court in Buono, I mean, the ñ someone could have a ñ a park could have a virtual tour of its park and have one page devoted to a war memorial, and no one would have standing. We believe that the consequences of not finding standing are significant and will open a Pandora's box. And with that, we'll conclude. Thank you. Thank you. Mr. Chairman, I would like to consult both of you. The matter is going to be submitted. By the way, before you leave, is there any connection between Caldwell and Caldwell? No, maybe long ago. It didn't take long. All right. Well, next, your argument in Capital Attack v. Goodman.
judges: Fletcher, Rymer, Duffy